FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUN 13  AM 10: 45

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

versus

BRYAN ANTHONY THOMAS, SR.

CRIMINAL ACTION

NUMBER 00-287

SECTION: "F"

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF PURSUANT TO 28 U.S.C. § 2255

The United States of America, through the undersigned Assistant United States Attorney, hereby opposes Bryan Anthony Thomas, Sr.'s motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence by a person in federal custody.  Thomas's claim that he is entitled to collaterally challenge his sentence on the basis of the Supreme Court decisions in Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and in United States v. Booker, ___ U.S. ___, 125 S.Ct. 738 (2005) is without merit. Furthermore, the defendant's motion is untimely because more than one year has elapsed from the time Thomas's conviction became final until he filed the instant motion.  Had Thomas filed a timely motion under 28 U.S.C. § 2255, it would be barred by the post-conviction proceedings waiver contained in the plea agreement which he entered.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

Accordingly, the Government respectfully requests that Thomas's § 2255 motion be denied without an evidentiary hearing.

## Relevant Facts and Procedural History

This criminal action arises out of an investigation by the Federal Bureau of Investigation of a ponzi scheme perpetrated by Thomas.[1]  From April 1998 through August 2000, Thomas duped individuals ( hereafter "Investors") into signing fraudulent and fictitious contracts involving financial investments with him through his company BDT.  Thomas represented that he was the funds manager of a program which involved the buying and selling of medium-term notes for a profit. Profits would be passed to the Investors.  Thomas represented that the Investors' principal was guaranteed and protected and that the Investors could get their principal back anytime (with three days notice).  Thomas represented that he had specialized expertise to successfully place funds for trade.  Thomas represented that the Investors' funds would be wired into his Escrow Account and that this Escrow Account would at all times maintain a balance equal to the Investors' principal. Thomas guaranteed Investors a ten (10%) percent interest rate return on their investment each month.

An analysis of banking records by the Federal Bureau of Investigations (FBI) reflected that the Escrow Account did not maintain a balance equal to the Investors' principal at all times as promised, nor were funds wired to anyone for investment purposes.  The analysis showed that Bryan

---

[1]The factual basis signed by Thomas and his counsel is attached as Exhibit A.

Thomas used the funds for his own personal use through the purchase of clothing, jewelry, cars, property, and entertainment. Thomas simply used new Investors' money to make the interest payments to other Investors in order to create the appearance that the Investors were actually earning 10% interest a month on their principal investments. All in all, Thomas deposited approximately $7,000,000 into his bank accounts, with a net loss to the Investors of approximately $3,092,004.64. None of the $7,000,000 was ever invested or even wired out of his bank accounts for investment purposes.

At the government's request, Thomas and the government met on June 23, 2000. Thomas confessed to carrying out the ponzi scheme and, after being advised that he had a right to have an attorney represent him, signed a plea agreement. Thomas, told by the government that he could not continue the ponzi scheme, made arrangements to turn over approximately $717,874.78 of victim funds he had sitting in his bank accounts.

Shortly thereafter, Thomas's defense counsel (Defense Counsel) contacted the government to acknowledge his representation and to inform the government that Thomas was working with the FBI in order to earn a downward departure pursuant to U.S.S.G. §5K1.1. During a meeting in July, 2000, with Assistant United States Attorneys (AUSAs), FBI agents, and his attorney, Thomas requested that certain victims be paid their monthly "interest payments" while he was working undercover with the FBI. The AUSAs strenuously objected to Thomas taking any action to continue the ponzi scheme. They unequivocally informed Thomas that the judge was the only one who could

3

make a decision on who got paid. The AUSAs informed Thomas that he must tell the truth and that if he lied, the June 23, 2000, plea agreement could be broken. Again, Thomas was informed that his criminal activity involving the ponzi scheme and the victims had to cease.

Unbeknownst to the government at that meeting, Thomas had already made arrangements to pay certain victims and had told Investors that the federal government was investigating certain Investors and had frozen his Escrow Account . Thomas lied to Ms. Anna Jones, an Investor, six days earlier when he told her that he needed $600,000 in order to pay Investors their monthly interest payments to keep the program running because the government had frozen the Escrow Account. By August 2, 2000, at Thomas's direction, Ms. Jones had wired $600,000 of her money to six Investors. Thomas assured Ms. Jones that her $600,000 would be returned to her in a few weeks when the government released the funds. At no point during July and early August did Thomas inform Ms. Jones that she was a victim of a ponzi scheme along with twenty-five others, or that he had agreed to plead guilty to a wire fraud scheme pursuant to a plea agreement dated June 23, 2000.

A group of Investors and Thomas had arranged to show up at the United States Attorney's office on Wednesday, August 16, 2000, to demand that their money be released. However, Thomas did not show up. The Investors were shocked to learn for the first time from the AUSAs that they had been victimized by Thomas and that Thomas he had been arrested on that date for wire fraud.

On September 14, 2000, an indictment was returned charging Thomas with the ponzi scheme, specifically charging him with one count of wire fraud, one count of bank fraud, one hundred fifty-

nine counts of money laundering and a notice of forfeiture. Thomas was arraigned on September 18, 2000 and pled not guilty. Defense Counsel obtained two continuances and the trial was set for February 12, 2001. On January 29, 2001, the government and Defense Counsel filed a joint motion to determine if Defense Counsel had a conflict in his representation of Thomas. Thomas's actions which resulted in the government's withdrawal of the plea agreement occurred during the time Defense Counsel represented the defendant. At the hearing, the district court meticulously informed Thomas of his right to have another attorney represent him, explaining the issues of the June 23, 2000 plea agreement and Thomas's actions, which resulted in the withdrawal of that plea agreement, as they related to a potential conflict should Defense Counsel be called as a witness on any of those issues. Based upon Thomas's repeated assurances, the district court allowed Defense Counsel to continue representation.

On January 31, 2001, pursuant to a written plea agreement signed by Thomas and Defense Counsel dated January 31, 2001, Thomas pled guilty to Count 1 of the indictment charging him with wire fraud in connection with his perpetration of a ponzi scheme and Count 3 charging him with money laundering. On May 2, 2001, Defense Counsel submitted a letter to the district court outlining his objections to the presentence investigation report. He advised that because some of the objections dealt with the original plea agreement, he may be a witness, and therefore, suggested that Thomas needed to retain another attorney.

On May 11, 2001, a petition was filed by Pretrial Services to revoke Thomas's bond based

upon Thomas's threat to "hurt" the Assistant United States Attorney handling his case. Thomas's new counsel (Second Defense Counsel) enrolled as co-counsel and a hearing was held. Thomas's bond was revoked and he was detained. On June 8, 2001, Second Defense Counsel filed motions to enforce the original plea agreement, for production of notes and to continue the sentencing. The government opposed all three motions. On July 18, 2001, a hearing was held on Thomas's motion to enforce the original plea agreement. The district court denied Thomas's motion to enforce the original plea agreement, finding that the June 23, 2000, plea agreement was invalid and not binding.

On July 18, 2001, the district court sentenced Thomas to 60 months as to count 1 and 97 months as to count 3, both to run concurrently. Thomas objected to the two level increase for abuse of position of public or private trust, arguing that he never said he was an investment broker, and to the +7 points for the total figure used for the money laundering calculation. The district court found that Thomas had lead Investors to believe that he was a legitimate investment broker and that he could not have carried out his scheme without presenting this position. The district court determined that the $600,000 Thomas stole from Ms. Jones to pay other Investors should be added to the $3,498,000 and denied Thomas's objection. The district court rejected the government's argument that Thomas had not accepted responsibility and awarded him a three level reduction. The government dismissed counts 2 and 4 through 161.

Thomas timely filed an appeal arguing that (1) the original June 23, 2000, plea agreement in which he only agreed to plead guilty to wire fraud should have been enforced; (2) his Defense

Counsel was ineffective for advising him to agree to the second plea agreement; and (3) the District

Court erred in calculating his sentence.  On March 11, 2002, the Fifth Circuit affirmed the district

court's judgment, finding that:

> Thomas executed the second plea agreement after the Government withdrew the first
> plea agreement prior to Thomas entering a plea or being indicted.  Under the facts of
> this case, we conclude that the Government was able to withdraw the first plea
> agreement prior to its acceptance by the district court.  See United States v. Ocanas,
> 628 F.2d 353, 358 (5th Cir. 1980).  We further conclude that Thomas breached the
> first plea agreement, which also justified the government's withdrawal.  See United
> States v. Ballis, 28 F. 3d 1399, 1409 (5th Cir. 1994).  In light of these conclusions,
> Thomas's counsel was not ineffective.  Thomas's plea agreement contained a valid
> waiver of his statutory appellate rights.  We conclude that Thomas's waiver was
> entered knowingly and voluntarily, and we therefore refuse to consider Thomas's
> other arguments.

United States v. Thomas, 34 Fed. Appx. 150, 2002 WL 493913(5th Cir. 2002).

The instant § 2255 motion was filed on May 11, 2005.

### Issue Presented

In his § 2255 motion, Thomas submits that in his plea agreement with the government he

reserved "his right to attack his sentence if it 'imposed in excess of statutory maximum' and based

upon United States v. Booker he is entitled to seek retroactive application of his right.  Thomas

Memorandum, p. 1.  Thomas argues that Booker creates a "newly recognized" right that is

retroactive and that the one year statute of limitations on his § 2255 motion began to run on the date

that Booker was initially decided.  Thomas alternatively requests that this Court transfer his motion

to the jurisdiction of his incarceration.

**LAW AND ARGUMENT**

A.    **Booker is not retroactive for cases on collateral review.**

Petitioner's claim that he is entitled to collaterally challenge his sentence on the basis of the Supreme Court decisions in Blakely v. Washington, 542 U.S. ____, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and in United States v. Booker, ___ U.S. ___, 125 S.Ct. 738 (2005) is without merit. The Blakely decision held that the sentencing procedures of the State of Washington violated the Sixth Amendment because the defendant received an enhanced sentence on the basis of factual findings made by a judge, not by a jury. Not until the decision in Booker, which was issued on January 12, 2005, did the Supreme Court find that the rationale of Blakely applied to the federal sentencing guidelines and convert the sentencing guidelines to an advisory, rather than a mandatory scheme. In doing so, the Supreme Court held that "we must apply today's holdings – both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act – to all cases on direct review," but declined to hold that the decision was to be applied retroactively to cases on collateral review. Booker, 125 S.Ct. at 769. Several circuit courts which have considered the issue have held that defendants whose convictions have become final are foreclosed from seeking initial collateral relief on the basis of Booker. *See,* Humphress v. United States, 398 F.3d 855, 863 (6th Cir. 2005); McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005); United States v. Price,    400 F.3d

844 (10ᵗʰ Cir. 2005); <u>Varela v. United States,</u> ____ F.3d ____, 2005 WL 367095 at *4 (11ᵗʰ Cir.

2005); <u>Guzman v. United States,</u> ____ F.3d ____, 2005 WL 803214 (2d Cir. 2005). Because the

<u>Booker</u> decision was issued subsequent to the date petitioner's conviction became final, it is not

applicable to his § 2255 motion for relief.


**B.**　**Thomas's motion is untimely because it was not filed within one year of the time his conviction became final.**

With respect to time limitations, 28 U.S.C. § 2255 provides in relevant part:

> A 1-year period of limitations shall apply to a motion under this section. The limitation period shall run from the latest of--
> (1) the date on which the judgment of conviction becomes final;
> (2) the date on which the impediment to making a motion created by the governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Because circumstances outlined in sections (2) through (4) are not applicable here, Thomas's § 2255

motion must have been filed within one year of the date his conviction became final.

The Fifth Circuit affirmed Thomas's conviction on March 11, 2002. "For the purpose of

starting the clock on § 2255's one-year limitation period, we hold, a judgment of conviction becomes

9

starting the clock on § 2255's one-year limitation period, we hold, a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." Clay v. United States, 537 U.S. 522, 525 (2003). Thomas did not file a petition for certiorari, therefore, his conviction was final on June 10, 2002, ninety days after the Fifth Circuit's decision. Thomas's motion under 28 U.S.C. § 2255 was not filed until May 11, 2005, over 23 months after the one-year time statute of limitations seeking such relief had expired. His motion should be dismissed as time-barred.

**C.     If he had filed a timely claim, pursuant to a provision of his plea agreement, Thomas waived his right to seek relief pursuant to 28 U.S.C. § 2255.**

In United States v. Wilkes, 20 F.3d 651 (5th Cir. 1994), the Fifth Circuit held that "an informed and voluntary waiver of post-conviction relief is effective to bar such relief." Id. at 653. The Wilkes court also recognized that "[s]uch a waiver may not always apply to a collateral attack based upon ineffective assistance of counsel." Id. (*citing* United States v. Abarca, 985 F.2d 1012, 1014 (9th Cir. 1993), *cert. denied*, 508 U.S. 979, 113 S.Ct. 2980, 125 L.Ed.2d 677 (1993)). With respect to ineffective assistance of counsel claims, such claims survive a waiver "only when the claimed assistance directly affected the validity of that waiver or the plea itself." United States v. White, 307 F.3d 336, 343 (5th Cir. 2002). If the plea or waiver itself was knowing and voluntary and if the issue raised may properly be the subject of a waiver, "then the guilty plea sustains the conviction and sentence and the waiver can be enforced." Id. at 343-344.

10

of what the plea connotes and of its consequence." United States v. Hernandez, 234 F.3d 252, 255

(5th Cir. 2000) (*citing* Boykin v. Alabama, 395 U.S. 238, 244, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)).

"The defendant need only understand the direct consequences of the plea; he need not be made aware

[of] every consequence that, absent a plea of guilty, would not otherwise occur." Hernandez, 234

F.3d at 255 (*citing* Trujillo v. United States, 377 F.2d 266, 266 (5th Cir.), *cert. denied*, 389 U.S. 899,

88 S.Ct. 224, 19 L.Ed..2d 221 (1967)).   For a guilty plea to be "voluntary," it must not be induced

by "'actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant'

or of state-induced motions so intense that the defendant was rendered unable to weigh rationally

his options with the help of counsel.'" Matthew v. Johnson, 201 F.3d 353, 365 (5th Cir. 2000)

(quoting Brady v. United States, 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.ED.2d 747 (1970)).   For an

appellate and collateral challenge waiver to be informed and voluntary, "[a] defendant must know

that he had a 'right to appeal his sentence and that he was giving up that right.'" United States v.

Portillo, 18 F.3d 290, 292 (5th Cir. 1994) (*quoting* United States v. Melancon, 972 F.2d 566, 567 (5th

Cir. 1992)).

      Ineffective assistance of counsel claims are not excepted from such waivers if the waiver was

knowing and voluntary.   As observed in White, "[i]f all ineffective assistance of counsel claims

were immune from waiver, any complaint about the process could be brought in a collateral attack

by merely challenging the attorney's failure to achieve the desired result. A knowing and intelligent

waiver should not be so easily evaded." 307 F.3d at 344.

Thomas's § 2255 motion contains no factual or legal allegations, either general or specific, which suggest that his plea or his entry into the plea agreement, and particularly his waiver of the right to pursue appellate and collateral waiver, was without knowledge or was involuntary. In fact, the issue of the voluntariness of Thomas's waiver has previously been decided by the Fifth Circuit. The court determined that, "Thomas's plea agreement contained a valid waiver of his statutory appellate rights. We conclude that Thomas's waiver was entered knowingly and voluntarily...." United States v. Thomas, 34 Fed. Appx. 150, 2002 WL 493913(5th Cir. 2002). Therefore, under the law of the case doctrine, the issue of Thomas's knowing and voluntary waiver may not be revisited. United States v. Matthews, 312 F.3d 652, 657 (5th Cir. 2002)("Under the law of the case doctrine, an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on subsequent appeal.").

## CONCLUSION

Thomas's motion pursuant to 28 U.S.C. § 2255 is without merit for several reasons. First, United States v. Booker, upon which Thomas bases his motion, is not retroactive on collateral review and as such, Thomas's motion which it should be dismissed without an examination of the merits. Second, Thomas's motion is untimely as it was not filed within one year of the time his conviction became final. However, if Thomas had filed a timely § 2255 motion, it would be subject to dismissal because he knowingly and voluntarily waived his right to collaterally challenge his conviction when

12

he entered into the plea agreement with the government.  Petitioner, Bryan Anthony Thomas, Sr.,

is not entitled to relief pursuant to 28 U.S.C. § 2255.  Accordingly, the government respectfully

requests that this Court deny Thomas's motion under 28 U.S.C. § 2255 without allowing discovery

and without an evidentiary hearing.

                                        Respectfully submitted,

                                        **JIM LETTEN**
                                        **UNITED STATES ATTORNEY**


                                        **DOROTHY MANNING TAYLOR**
                                        Assistant United States Attorney
                                        Bar Roll No. 12678
                                        500 Poydras St., Room 210 B
                                        New Orleans, Louisiana   70130
                                        Telephone: (504) 680-3083

CERTIFICATE OF SERVICE
I certify that a copy of the
foregoing has been served upon
the *pro se* defendant
by mailing the same to him,
properly addressed and postage
prepaid this _____ day of _____
_____, 2005.
_____
Assistant United States Attorney

13

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 31 PM 3:55

LORETTA G. WHYTE
CLERK

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO.  00-287 |
| v. | * | SECTION:  "T" |
| BRYAN A. THOMAS, SR. | | |
| | * | VIOLATIONS:  18 U.S.C.§ 1343 |
| | | 18 U.S.C.§ 1956 |
| | | (a)(1)(A)(i) |

\*       \*       \*

## FACTUAL BASIS

Should this matter proceed to trial, the government would
prove the following through competent evidence and testimony:

A representative of Bank One located in New Orleans,
Louisiana, would testify that BDT Asset Management, L.L.C. ("BDT")
located at 1425 Broad Street, Suite 200, New Orleans, Louisiana,
was a company owned by the defendant **BRYAN ANTHONY THOMAS, SR.**,
which had an account at Bank One.  Bank One was a financial
institution, the deposits of which were insured by the Federal

1

Fee_____
Process_____
X  Dktd_____
CtRmDep_____
Doc.No._____

Deposit Insurance Corporation.  It was a financial institution which engaged in, and the activities of which affected, interstate commerce.

A representative of U.S. Bank located in Reno, Nevada would testify that BDT had an account U.S. Bank.  U.S. Bank was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.  It was a financial institution which engaged in, and the activities of which affected, interstate commerce.

A representative of Hibernia National Bank located in New Orleans, Louisiana, would testify that BDT had an account at Hibernia.  Hibernia was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation. It was a financial institution which engaged in, and the activities of which affected, interstate commerce.

Individuals hereafter collectively referred to "Investors" would testify that **BRYAN ANTHONY THOMAS, SR.**, duped them into signing fraudulent and fictitious contracts involving financial investments with him through his company BDT.  That from April 1998 through August 2000, **BRYAN ANTHONY THOMAS, SR.**, devised a scheme to defraud Investors by means of false and fraudulent pretenses, representations, and promises, in connection with his promotion as an investment counselor as described in the fictitious contracts

2

between BDT and Investors.  Thomas required each Investor to sign a document titled "Deposit Agreement (Capital Funding Program)" which contained the following material false statements, representations and promises:

      a.   Investors monies were to provide a funding source for project funding and the profit on the project would be generated by the defendant.

      b.   The defendant represented that he had specialized expertise to successfully place funds for trade.

      c.   The defendant represented that the Investors' funds would be wired into his Escrow Account and that this Escrow Account would at all times maintain a balance equal to the Investors' principal.

      d.   That a "Bank Guarantee" existed that equaled 106% of the Investors' principal.  Additionally, should the "Bank Guarantee" be cashed out, the Investors would receive additional earnings on a pro rata basis.

      e.   Investors were guaranteed a ten (10%) percent interest rate return on their investment each month which would be paid to them per trading cycle.

      f.   The Investors' first profit return would be on or before the expiration of thirty (30) "International Banking Days."

In addition to what was outlined in the Deposit Agreement, the Investors would further testify that **BRYAN ANTHONY THOMAS, SR.,** made oral material misrepresentations to induce them to sign the bogus Deposit Agreement and invest funds with his company. Such misrepresentations included the following:

a.   The defendant was the funds manager of the "Capital Funding Program" which involved the buying and selling of medium-term notes or corporate bonds. Medium-term notes would be traded to create profits. Profits would be passed to the Investors.

b.   The defendant conducted two and one-half  years of due diligence on the "Capital Funding Program."

c.   The Investors' principal was guaranteed and protected.

d.   All interest payments had been made and were current.

e.   The trading in medium-term notes and corporate bonds was safe and secure.

f.   The Investors could get their principal back anytime (with three days notice).

Based upon these assurances that their money would be safe, Investors would tesfity that they gave **BRYAN ANTHONY THOMAS, SR.,** money totalling approximately $7 million.  Some Investors would further testify that they then received from BDT, funds purportedly

4

representing interest payments based on a fictitious "trading cycle". However, other Investors would testify that they did not receive any purported interest payments.

All the Investors would testify that **BRYAN ANTHONY THOMAS, SR.** did not inform them that he had diverted their funds to his personal use in the form of cash and purchases of items including, but not limited to, automobiles, clothing, jewelry and real estate.

A special agent with the Federal Bureau of Investigations would testify that he has conducted an analysis of the banking records of BDT and has determined that the Escrow Account (BDT) did not maintain a balance equal to the Investors' principal at all times as promised in the Deposit Agreement. He further determined that no funds were wired to anyone for investment purposes. In fact the analysis shows that Bryan Thomas used the funds for his own personal use through the purchase of clothing, jewelry, cars, property, and entertainment.

The Special Agent would further testify that there was no "trading cycle" and **BRYAN ANTHONY THOMAS, SR.** was simply using new Investors' money to make the interest payments to other Investors in order to create the appearance that the Investors were actually earning 10% interest a month on their principal investments. He would testify that this is called a "Ponzi Scheme."

5

That he used the funds to promote the wire fraud scheme set forth in the indictment and that the bank records reflect that the Investors deposited approximately $7 million dollars in the scheme.

The Special Agent would testify that beginning on or about July 29, 1999, and continuing until August 17, 1999, **BRYAN ANTHONY THOMAS, SR.** knowingly and willfully executed and attempted to execute a scheme and artifice to defraud Bank One.  That on the dates listed below, the defendant caused to be deposited into Bank One, account number 1574917025, worthless checks, in the below listed amounts, all drawn on account number 153790085515 at U.S. Bank in Reno, Nevada:

| Date | Amount worthless deposit |
|------|--------------------------|
| July 29, 1999 | $  50,000.00 |
| August 2, 1999 | $  65,000.00 |
| August 13, 1999 | $ 147,500.00 |
| August 17, 1999 | $ 150,000.00 |
| Total | $ 412,500.00 |

A review of the bank records reveal that the defendant withdrew money out of Bank One, account 1574917025, based on the above listed deposits, knowing that there were insufficient funds to cover the withdrawals.

6

The Special Agent would testify that beginning on or about July 14, 1998, the defendant transferred through checks, debit memos and wire transfers approximately $3,852,495.36 from Bank One and Hibernia Bank knowing that the $3,852,495.36 represented the proceeds of some form of unlawful activity (the wire fraud set forth in paragraph B of Count 1), and that these financial transactions affected interstate commerce and were sent to Investors bank accounts with the intent to promote the carrying on of the Ponzi Scheme outlined in Count 1 by lulling the Investors in connection with the scheme.

The Special Agent would further testify that the amount of loss to the victims of the Ponzi Scheme was approximately $3,092,004.64.

The Special Agent would testify that from April 22, 1999, to June 19, 2000, the defendant wired approximately $2.6 million from Bank One and Hibernia in New Orleans, Louisiana to Investors.

Also introduced into evidence would be the documents provided to each Investor, all the bank statements and supporting data for the bank accounts listed in the Indictment and documentation reflecting proof of the purchases of real property with proceeds from the scheme.

BRYAN ANTHONY THOMAS, SR.                          1/31/01
                                                    DATE

MICHAEL S. ZERLIN, ESQ.                            1/31/01
                                                    DATE

7